# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

YOLANDA YOUNG-SMITH,      )
      )
      Plaintiff,      )
      )
      v.      )      Cause No. 3:07 CV 629
      )
BAYER HEALTH CARE, LLC      )
AND THERESA ENGLEBRECHT      )
in her personality and official capacity,      )
and UNITED STEELWORKERS OF      )
AMERICA, AFL-CIO, CLC on behalf of      )
LOCAL UNION NO. 12273      )
      )
      Defendants.      )

## OPINION AND ORDER

Presently before the Court is Defendant United Steelworkers Local 12273's ("the Local's") Motion for Summary Judgment [DE 67] and its Supplemental Motion for Summary Judgment [DE 84]. Also before the Court is the Local's Motion to Strike [DE 86]. Briefing on all of these motions was completed on September 14, 2010. For the reasons that follow, the Motion for Summary Judgment will be GRANTED in part and DENIED in part. The Supplemental Motion for Summary Judgment is DENIED. The Motion to Strike will be DENIED in all respects as MOOT.

## Factual Background

Yolanda Young-Smith ("Young-Smith"), a black female, was an hourly employee at Bayer Health Care, LLC ("Bayer") and its predecessors at facilities in Indiana from 1982 until she was terminated from the Mishawaka plant on August 8, 2006. At the time she was terminated, Young-Smith was a member of United Steelworkers Local 12273 ("the Local Union") and covered by the

collective bargaining agreement between the Union and Bayer.

## CBA Provisions

The Local Union represents the approximately 158 Bayer employees. The bargaining unit is composed of all non-supervisory production and maintenance employees. The governing board, consisting of the President, Vice President, Recording Secretary, Financial Secretary, Treasurer, Guide Guard, and Trustee, is responsible for the administration of the Local Union. At the time of Young-Smith's termination, Frank Troyer ("Troyer") was the president of the Local Union. In addition to the officers listed above, the Local Union has a Bargaining and Grievance Committee that assists the International Union with negotiations for a collective bargaining agreement with Bayer and handles grievances filed by union members during the first three steps of the grievance procedure.

The United Steelworkers, AFL-CIO, CLC (the "International Union") is the certified bargaining representative and contracting party at Bayer. Pursuant to the International Union's Constitution, no local union has the authority to bind the International Union without the International Union's express authority and money obtained from dues pursuant to the CBA are sent to the International Union. The International Union is responsible for the arbitration of all grievances from the Bayer Healthcare plant in Mishawaka, Indiana.

The Collective Bargaining Agreement ("CBA") contains a "Discipline and Discharge" clause that states: "The Company retains the sole right to discipline and discharge employees for just cause, provided that in the exercise of this right it will not act wrongfully or unjustly or in violation of the terms of this Agreement." CBA §3, Article IV. The CBA further provides that "Complaints that the Company has violated this paragraph may be taken up through the Grievance Procedure

provided in this Agreement." *Id.* As part of the Grievance Procedure, the CBA provides for an "expedited arbitration procedure." CBA §2, Article VII.[1]

The CBA contains an EEO Policy Statement acknowledging that the Local Union recognizes its responsibilities under federal and state anti-discrimination laws. In addition, the CBA has an anti-discrimination provision stating that "the Company and the Union agree that the provisions of this Agreement shall apply to all employees covered by this agreement without discrimination and in carrying out their respective obligations under this Agreement neither will discriminate against any employee on account of race, color, age, national origin, sex, disability, or creed..." CBA §1, Article XI. The CBA further establishes a Joint Committee on Civil Rights that is charged with the review of matters involving the civil rights of employees covered by the CBA and advising both the Company and the Union.

**<u>The Grievance Process</u>**

Article IV of the CBA between the Union and Bayer contains a four step grievance procedure. (Troyer Declaration, ¶7). In the first step, the employee is entitled to meet with his/her supervisor to discuss a grievance. (*Id.*) The employee is entitled to have a union steward at the meeting. (*Id.*) If the grievance is not resolved and the employee wishes to proceed, the grievance is then reduced to writing and is filed at step two of the procedure.(*Id.*)

As a general matter, usually both the employee and union steward sign the grievance and both participate in the writing of the grievance. (Troyer Declaration ¶8, 9). As part of the grievance filing the Local Union attempts to cite to a specific provision of the contract as well as state "and

---

[1]The "Expedited Labor Arbitration Procedure is primarily intended for routine cases, such as alleged contract violations not involving significant company liability..." CBA, §2b, Article VII.

all other applicable provisions." (*Id.* at ¶8). The citation to a specific section of the contract is necessary to allow the company and the Union to define the issue and because it improves the chances of sustaining the grievance. (*Id.*) The "other applicable provisions" language allows the Union an opportunity to add to or amend a grievance if it has an additional argument later in the procedure. (*Id.*).

After the grievance is reduced to writing, the company has 5 days to give the Union a written answer under Article VI, Section 7(c) of the contract. If the Union is not satisfied with the answer, it may process the grievance to step 3 of the grievance procedure. (Troyer Declaration, ¶10).

Throughout the year, the Union and the Company have specified dates for hearing third step greivances. The International Representative assigned to service the Local by the International Union participates in these third step meetings. (Troyer Declaration, ¶11). If the grievance is not resolved in step three, the Union may advance the case to final and binding arbitration under the contract. (Troyer Declaration ¶13).

The International Representative and the Bargaining and Grievance Committee work together to decide which cases should be advanced to arbitration. (*Id.*). The decision to take a case to arbitration involves consideration of numerous factors including the cost of arbitrating, the chance of success, the adverse consequences of a negative decision and the importance of the matter to the grievant. (*Id.*). The Union maintains a policy of always arbitrating discharge cases unless the employee opts out from pursuing the matter or unless a settlement was reached. (*Id.*).

Once the decision is made to take the case to arbitration, the International Representative has primary responsibility for the case and acts as an advocate for the grievant, putting on evidence to support the Union's case and arguing and briefing the Union's position. (Troyer Declaration ¶14).

In discipline cases, the Union has the option of demanding expedited arbitration under the contract provisions. (Troyer Declaration ¶15). According to the Union, in discharge cases, it always demands expedited arbitration. (*Id.*).

**Young-Smith's Termination and Grievance**

On August 8, 2006, Young-Smith was terminated from Bayer for insubordination.[2] More specifically, Bayer contends that Young-Smith allegedly violated Work Rule No. 54 which prohibits "Unlawful or improper conduct off the plant premises or during non-working hours which adversely affects the employee's relationship to the job, fellow employees, a supervisor, or discredits the Company's products, reputation or goodwill in the community." At the time of her termination, Young-Smith's immediate supervisor was Theresa Englebrecht ("Englebrecht").

Young-Smith's problems at Bayer began, at least according to Bayer's version of events, because Young-Smith had personal issues with co-workers Rebecca Holt ("Holt") and Jimmy Robinson ("Robinsion"). Young-Smith discovered that Holt, who is married, was engaged in a sexual affair with Robinson. Young-Smith then contacted Holt's husband by telephone from the workplace to inform him of the affair.

Young-Smith's version of these events is a bit different. She asserts that after she learned of the affair, Holt became increasingly hostile to her and another co-worker accusing both of desiring a relationship with Robinson. (Young Smith Aff. ¶4). Young-Smith contends that she was fearful of Holt who threatened her on at least one occasion and continued to accuse her of wanting her own relationship with Robinson. Given this behavior by Holt, which apparently occurred inside

---

[2]Bayer has 58 Company Rules. None of them specifically address "insubordination." The Disciplinary Action Report lists the violation type as "Insubordination Company Rule #54." Plaintiff's Exh. B.

the workplace, Young-Smith contacted Holt's husband outside the workplace. She did so with the hope that the affair would stop and Holt would cease her threatening behavior and comments toward Young-Smith, all of which she believed had occurred because of the affair. (*Id.*).

After these events came to light, on June 28, 2006, Englebrecht requested Young-Smith attend a meeting with the Human Resource Manager and Holt and Robinson. According to Young-Smith, she was advised not to attend the meeting by her union steward, Coen Lytle ("Lytle"), because of threats she had previously received from Holt. As a result of not attending the meeting, Young-Smith received a disciplinary note and was suspended for the balance of her shift. Young-Smith, in turn, filed a grievance with the Local Union. The Local Union did not pursue the grievance beyond the first three steps and withdrew it on November 27, 2007 after accepting Bayer's third step answer. (Pltf's Exh E, Docket #71-3, p. 6).

At some point after Young-Smith's brief suspension, Bayer specifically instructed Young-Smith to cease contacting Holt's husband because her contact was causing disruption and conflict in the workplace. According to Bayer, Young-Smith persisted in her contacts with Holt's husband. As a result, Bayer terminated her employment for insubordination. As part of its decision to discharge her, Bayer also relied upon Young-Smith's refusal to attend the June 28, 2006 meeting.

The Local Union filed a grievance on Young-Smith's behalf challenging her discharge. Her grievance specifically challenged the discharge claiming it was without just cause and thus, it violated the CBA. In addition, the Union reserved the right to argue "all other applicable CBA provisions." Young-Smith specifically requested that the Union assert a separate claim of race discrimination and/or disparate impact against Bayer. There is no notation on the form alleging a separate violation of the CBA due to race discrimination.

After proceeding through the first three steps of the grievance procedure, the International Union agreed to take Young-Smith's grievance to arbitration although it appears that the Local Union Bargaining and Grievance Committee also participated in Young-Smith's arbitration proceedings. As part of its general practice to relieve the financial strain on an employee, the Local Union demanded expedited arbitration in Young-Smith's case.

Phillip Bischoff ("Bischoff") represented the International Union in the arbitration of the grievance challenging Young-Smith's discharge. (Bischoff Declaration, ¶3). Bischoff was responsible for selecting and preparing Union witnesses and presenting the arguments and briefs which summarized the Union's position. (*Id.*). According to Bischoff, the fact that the grievance was handled through the expedited arbitration process did not affect his preparation or presentation of the case. (Bischoff Declaration, ¶6). He conducted the same cross-examinations, called the same witnesses, and made the same arguments as he would have in a regular arbitration. (*Id.*)

Young-Smith requested that the International Union permit her to have her own attorney present at the discharge arbitration. The International Union denied the request relying upon its policy prohibiting employees from having their own personal attorneys represent them at arbitration hearings. (Bischoff Declaration, ¶7). Bischoff explained that the substantive right to demand "just cause" for discharge and procedural rights is between the company and the Union. (*Id.*). The Union has a strong interest in the development of a consistent body of law that would be undermined if attorneys representing the employees were allowed to participate in the arbitration hearings. (*Id.*). In addition, Bischoff indicates that participation by outside lawyers in arbitration hearings extends the length and expense of the hearings.

According to Bischoff, Young-Smith did not provide him with any information which

suggested that race discrimination factored into her discharge. (Bischoff Declaration, ¶11: "Aside from her general assertions, and aside from the evidence regarding Becky Holt and Jimmy Robinson, Ms. Young-Smith did not show me specific evidence that her discharge was the product of racial discrimination.") Bischoff was aware, however, that Holt, who is white, had committed comparable offenses to that of Young-Smith and had been treated more favorably. (Bischoff Declaration, ¶9). As a result, he argued during the arbitration that Holt's workplace affair disrupted the workplace for over a year and a half and that Holt had threatened Young-Smith. Despite this behavior Bayer did not discipline or terminate Holt. He also argued that discharge was too harsh a penalty for the offense. (*Id.*). With respect to Young-Smith's refusal to attend the June 2006 meeting, Bischoff argued that she reasonably feared for her safety and was justified not to attend. (*Id.*). Bischoff did not, however, argue separately that Bayer has a pattern or practice of discriminating against black workers. According to Bischoff, "it made no sense in Ms. Young-Smith's case for the union to take on the burden of proof by alleging that the company had acted in a racially discriminatory way." (Bischoff Declaration, ¶10).

The arbitrator issued a decision upholding Bayer's discharge of Young-Smith as meeting the requirements of just cause under the CBA. The arbitrator concluded that Young-Smith "had repeatedly continued to fuel a controversy with two other employees, significantly burdening the workplace with private issues, long after she had been ordered not to do so." In addition, the arbitrator found that "to the best of management's knowledge, the other two employees [Holt and Robinson] had stopped disrupting the workplace with private issues." As a result, the arbitrator found that Young-Smith's termination was justified.

Beginning in May 2006, John Carlson ("Carlson"), a member of the Union Bargaining and

Grievance Committee, regularly spoke with Young-Smith concerning her grievance. (Pltf. Aff. ¶3). According to Young-Smith, Carlson regularly expressed concerns to her that the Union was not representing her as aggressively as it represented other Union members in that the Union would not use evidence of Holt's harassment and threats directed at Young-Smith and failed to conduct a pre-arbitration meeting as set out in the grievance procedures of the CBA (*Id.* at ¶3, 9). Young-Smith also avers that throughout the arbitration process, she repeatedly asked Bischoff to get statements from her black co-workers and others so that she could assert a claim that different, more harsh standards are applied to black workers. (Pltf. Aff. ¶5). In addition, she notified Union officials that she wanted a regular arbitration, with counsel provided at her expense, and with witnesses who would support her contention that race discrimination and retaliation played a role in her discharge. None of these requests were permitted. (*Id.* at 7). Young-Smith requested that Carlson be able to present her case rather than Bischoff. This request was also denied. (*Id.*)

The Local Union resolves some discharge grievances by obtaining reinstatement or "Last Chance Agreements" prior to the arbitration step in the CBA. (Troyer Dec. ¶s 16, 18). A Last Chance Agreement is an agreement offered by the employer after discussions with the Union to reinstate a terminated employee subject to the stipulations in the Last Chance Agreement itself. Failure to follow the agreement results in immediate termination of the employee. In instances where Last Chance Agreements are obtained, the Local Union counsels employees who are offered Last Chance Agreements to ascertain whether they wish to accept the agreement or proceed to arbitration. It is undisputed that Bayer did not offer Young-Smith a Last Chance Agreement and thus, reinstatement absent successful arbitration was not an option for Young-Smith.

After the arbitration decision was issued, the Plaintiff filed an EEOC charge against the

Union and eventually filed the present lawsuit on December 21, 2007 asserting claims asserts under

Title VII and 42 U.S.C. §1981 against both the Local Union and Bayer. On October 27, 2009,

Young-Smith settled her claims against Bayer leaving the Local Union as the remaining defendant.

**Prior Attempts to Assert Race Discrimination Grievances**

In June 2005, Young-Smith and 5 other black employees met with an attorney regarding their

belief that Bayer was discriminating against black workers. (Pltf. Aff. ¶6). Beginning sometime in

2004, Young-Smith testified that she spoke with Earl Fizer ("Fizer"), Chairman of the Bargaining

and Grievance Committee on several occasions and expressed her belief that Bayer discriminated

against black workers. [3] Young-Smith requested that Fizer write a grievance for discrimination.[4]

To say that the record is vague as to the details of these conversations, when they occurred, who was

present, what was discussed, when the request was made etc., would be an understatement. Several

other times in 2005, the details of which are undisclosed in the record, Young-Smith testified that

she requested discrimination grievances be filed and the Union refused. (Young-Smith Dep. Pp. 95-

110).

However, in 2003 and 2004, Local Union stewards represented Young-Smith in grievance

hearings for two separate grievances filed by her wherein she argued that Bayer was applying a

"double standard" in its treatment of her vis-a-vis its treatment of white employees. These

grievances resolved favorably to Young-Smith.

Young-Smith also avers that after she was threatened by Holt, she spoke with Troyer in May

---

[3]Because of the vagueness of these allegations, the Union moves separately for summary judgment on the grounds that some of the complaints are time-barred and others are too vague to consider. This will be addressed in the body of the Opinion.

[4]Fizer disputes that he was ever asked by anyone, including Young-Smith, to write a discrimination grievance.

and June 2006 regarding Bayer's zero tolerance policy relating to workplace violence and the uneven enforcement of that policy. (Second Decl. of Young-Smith, ¶2). During these conversations, Young-Smith asked Troyer to filed a grievance alleging race discrimination in the enforcement of the zero tolerance policy. He refused to do so. (*Id.*).

In late June, early July 2006, after she was disciplined for not attending the meeting with Holt and Englebrecht, Young-Smith spoke again to Troyer and asked him to file a grievance alleging race discrimination based on the fact that Holt did not attend a meeting a month earlier and was not reprimanded. (*Id.* at ¶3). As noted elsewhere, a grievance was filed on Young-Smith's behalf relating to this incident alleging that Young-Smith was "put in a hostile environment." (Doc #71-3). It was later dismissed by the Union after proceeding through the third step and accepting Bayer's third step answer to the grievance..

**Union's Response to Young-Smith's Assertion of Race Discrimination**

The Union has submitted a plethora of evidence designed to combat Young-Smith's assertions the Union discriminates against black employees. In particular, Troyer reviewed the Union's grievance files and identified all of the employees who have been discharged from Bayer since 2001. The chart below excludes probationary employees who are not subject to the terms and conditions of the CBA:

| Year | Total Discharged Employees | White Employees Discharged | White Employees Given LCAs[5] | Black Employees Discharged | Black Employees Given LCAs |
|------|---------|---------|---------|---------|---------|
|      |         |         |         |         |         |

---

[5]LCA stands for Last Chance Agreement.

| 2001 | 11 | 9 | 3[6] | 2 | 2 |
|------|----|----|------|----|----|
| 2002 | 2 | 0 | 0 | 2 | 1 |
| 2003 | 5 | 2 | 2 | 3 | 3 |
| 2004 | 2 | 1 | 1 | 1 | 0 |
| 2005 | 6 | 4 | 3 | 2 | 1 |
| 2006 | 5 | 3 | 2 | 2 | 0 |
| 2007 | 2 | 1 | 0 | 1 | 1 |
| TOTAL | 33 | 20 | 11 (55%) | 13 | 7 (53%) |

Of the discharged employees approximately 50% of both black and white employees were offered last chance agreements. There is no substantive difference between the last chance agreements negotiated for black workers as white workers. (Troyer Dec. ¶18). Troyer cites to two instances where two employees, one black and one white, were discharged and both employees received identical Last Chance Agreements. (*Id.* at ¶19).

Troyer also reviewed the grievance files of the Union and submitted 9 grievances alleging claims of discrimination citing to Article XI, Section 1 of the CBA. That provision states: "The Company and Union agree that the provisions of this Agreement shall apply to all employees covered by this Agreement without discrimination and in carrying out their respective obligations under this Agreement neither will discriminate against any employee on account of race, color, age, national origin, sex, disability, or creed; and not to discriminate against disabled veterans or Vietnam era veterans."

In response to this evidence, Young-Smith asserts that although nearly an equal number of

_____

[6]For reasons undisclosed in the record, two white employees, David Ward and David Umbenhauer were given two Last Chance Agreements each.

discharged black and discharged white employees received last chance agreement, a disproportionate number of black workers were eventually discharged for violating those last chance agreements while white workers successfully returned to employment. According to Young-Smith's statistical evidence 5 of the 7[7] black workers who received last chance agreements were later discharged while none of the white workers receiving last chance agreements were discharged. Further, she notes that no black workers were reinstated pursuant to a settlement while 4 white workers were reinstated. Thus, based upon her numbers, she argues that a disproportionate number of black workers were actually discharged from Bayer compared to their white counterparts.

### Applicable Standard

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(c)(2). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported

---

[7]Young-Smith shows 8 black workers were offered last chance agreements but the exhibits presented to the Court by the Union shows only 7 last chance agreements issued to black workers and 11 issued to white workers. Thus, both the number of last chance agreements for white workers and black workers has been reduced by 1 on each side.

motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson,* 477 U.S. at 255 (quoting Fed R. Civ. P. 56(e)).

## **DISCUSSION**

By statute, Congress has proscribed racial discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Inasmuch as "[t]he constitution of a local union ... is a contract between the union and its members," *Korzen v. Local Union 705,* 75 F.3d 285, 288 (7th Cir.1996) (citations omitted), and inasmuch as unions represent their members in employment contracts, unions may not engage in racial discrimination against their members, *see, e.g., Goodman v. Lukens Steel Co.,* 482 U.S. 656, 669 (1987) (holding that union violated § 1981 by refusing to file grievances for racial discrimination by black members). As the parties agree, the standards for proving a § 1981 violation are essentially the same as for proving a Title VII violation. *EEOC v. Pipefitters Ass'n. Local Union 597,* 334 F.3d 656, 658 (7th Cir.2003) (collecting cases).

The Union has moved for summary judgment on a variety of grounds, some of which, have been complicated by a misunderstanding as to the claims Young-Smith is asserting in this lawsuit. In her Complaint, Young-Smith alleges race discrimination by the Local Union in (1) its refusal to pursue a regular arbitration, instead of expedited arbitration; (2) its manner of conducting the expedited arbitration; (3) allowing Bayer to engage in race discrimination and retaliation; (4) treating black Union members differently than white Union members in determining which grievances to file and which grievances to pursue to arbitration; and (5) refusing to assert race discrimination as a ground for grievances.

Believing Young-Smith's allegations were based primarily on the handling of her discharge

arbitration, the Union moved for summary judgment contending first that Young-Smith did not name the International Union as a defendant and it was the International Union, not the Local Union that conducted the discharge arbitration. Second, the Union asserted that even if Young-Smith had named the proper defendant, there was no evidence that the Union acted in a discriminatory manner.

However, in her response to the Union's motion for summary judgment, Young-Smith argues that her primary claim is that the Union discriminates against black workers by refusing to allege race discrimination in its grievances. (Response, at p. 6 "Young-Smith's primary claim against the Union concerns its refusal to allege race discrimination in grievances."). This revelation led to the filing of a supplemental Motion for Summary Judgment by the Union wherein it asserts that many allegations by Young-Smith that the Union discriminated against her by refusing to grieve claims of race discrimination are time-barred. These contentions will be addressed at the appropriate time in this discussion.

Turning first to the Defendant's argument that Young-Smith sued the wrong defendant when she failed to separately name the International Union, this argument, even if well-taken, matters little since the substance of Young-Smith's claim, that is, that the Union discriminated against her in the processing of her grievance and the manner in which it conducted the arbitration, does not withstand summary judgment.

To prevail on her claim of discrimination against the Union, the *McDonnell Douglas* burden shifting test applies, as it does in all discrimination claims. Young-Smith must show: (1) the employer violated the collective bargaining agreement between the union and the employer; (2) the Union breached its own duty of fair representation by letting the breach go unrepaired; and (3) that some evidence indicates animus against blacks motivated the Union. *Johnson v. Artim*

*Transportation System, Inc.,* 826 F.2d 538, 542 (7th Cir.1987); *Greenslade v. Chicago Sun-Times, Inc.* 112 F.3d 853, 866 -867 (7th Cir. 1997). Once she navigates this initial showing the Union must proffer legitimate non-discriminatory reasons for its actions. Only then does the burden return to Young-Smith to demonstrate that the non-discriminatory reason proffered by the Union is pretextual, that is, a lie.

"The duty of fair representation and Title VII plainly overlap in that they both prohibit discrimination ... [c]onsequently, where a plaintiff claims that a union violated Title VII based on its failure to represent a member, courts [...]generally incorporate the duty of fair representation as one of the elements of the alleged Title VII violation." See *Aeosto,* 107 F.Supp.2d at 304 (collecting cases). Once the plaintiff establishes a breach of the duty of fair representation, she must demonstrate that the adverse action was motivated by unlawful discrimination or retaliation. *Burke v. CWA Local 1109,* 2009 WL 3805517, 3 (E.D.N.Y.,2009)

Here, Young-Smith asserts two claims. First, she asserts that Bayer discriminated against her by terminating her employment and the Union, in processing her grievance, did so in a manner that did not remedy Bayer's discrimination. In particular, she asserts that the Union breached its duty of fair representation by not aggressively representing her interests, by requesting expedited arbitration in lieu of regular arbitration, and by not permitting her to have a private lawyer attend the arbitration. Second, Young -Smith asserts that the Company racially discriminated against black employees generally and that the Union acquiesced in this discrimination by failing to pursue grievances brought to it by her and others asserting disparate treatment between black and white employees.

The Union, in turn, disputes that it breached its duty of fair representation either in its

representation of her generally or by failing to pursue claims of race discrimination brought to it by Union members. Second, the Union contends that even if it did breach its duty of representation Young-Smith has no evidence that unlawful discrimination or discriminatory animus motivated the breach.

The "duty of fair representation is implied from § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a)." *White v. White Rose Food,* 237 F.3d 174, 179 n. 3 (2d Cir.2001). A union breaches its duty of fair representation when its conduct towards a member is "arbitrary, discriminatory, or in bad faith," *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The union acts arbitrarily "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Air Line Pilots Ass'n. Int'l v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991).

### Young-Smith's Grievance Challenging her Discharge

It is appropriate to begin with what is uncontroverted in the record. There is no dispute that the Union grieved Young-Smith's termination, that it pursued the grievance through the negotiated provisions of the CBA on an expedited basis, and that despite its efforts, the arbitration ended in an unfavorable arbitration decision. Thus, with respect to the grievance that was filed on Young-Smith's behalf challenging her termination, the record is clear that she cannot sustain a claim of discrimination. She has not demonstrated that the Union failed to file or pursue a grievance challenging her discharge because they did. And, in turn, for this very same reason, Young-Smith cannot prove that the Union breached its duty of fair representation because she has not shown any arbitrary conduct.

But, Young-Smith's claim is not this simple. She argues that while the Union did file her grievance and took it through the arbitration process, it refused to argue the case the way she wanted it argued, it refused to allow her private counsel to be present, and it should not have utilized the expedited arbitration process. All of this, she urges, demonstrates arbitrary and discriminatory conduct. She also argues that the Union did not pursue the grievance as aggressively as she would have liked. Thus, her argument is not that the Union breached its duty by failing to represent and protect her interests. It is that the Union opted not to conform its process to the way Young-Smith wanted the grievance processed.

Young-Smith has two large hurdles to jump to be successful on this claim. First, she has to have some evidence that the process utilized by the Union somehow discriminated against her because of her race or that the Union did not follow negotiated grievance procedures. That is, she must demonstrate that the Union has a practice of treating, handling, and processing grievances filed by black workers different than those filed by white workers or that the negotiated grievance procedures are utilized differently for white and black workers She has absolutely no evidence to support such an argument. Instead, Young-Smith points to a statement she claims Carlson made to her wherein he provided his opinion that the Union's actions were not aggressive enough. Yet, even assuming Carlson made the statement,[8] it is speculative and there is nothing factual to support it. Indeed, the credibility of this statement is undermined substantially by the actions of the Union. Despite Carlson's opinion, the Union provided evidence that it uses the expedited arbitration

---

[8]The Union has moved to strike Carlson's statement as inadmissible hearsay. (Motion to Strike, ¶1(A) ). That portion of the Motion to Strike is DENIED as MOOT. For even considering the statement, Young-Smith has not raised a genuine issue of material fact that the Union disciminated against her on the basis of race.

process for all claims for which it can be utilized because typically this is the best course for individual employees who seek a return to work. This is precisely the reason why the process is contained within the CBA. The Union has also presented evidence that it has a policy not permitting private counsel to attend and participate in arbitration hearings because it undermines the Union's role as the bargaining representative for the employees. Young-Smith has no evidence whatsoever that these rules as set out by the Union were applied differently to black workers than white workers or that they were applied to her grievance but not the grievances of other employees. Moreover, Carlson's statement does not shed light on how the Union allegedly under-represented Young-Smith. Rather, even assuming the statement in a light favorable to Young-Smith, it is unhelpful in proving what steps the Union could have taken that would have been the sort of "aggressive" representation Young-Smith believes she was entitled to. *See Beeson v. Indiana Bell Telephone Co., Inc.,* 2005 WL 2100177, 8 (S.D.Ind. 2005) (employee's assertion that the Union failed to represent him with the utmost diligence insufficient to show that the Union breached its duty of fair representation); *Lexington Ins. Co. v. Western Pennsylvania Hospital,* 423 F.3d 318, 333 (3d Cir.2005) (" 'Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.' ") (citation omitted)). As a result, she has no evidence that her grievance was treated differently at all, let alone that the Union engaged in discrimination when it followed the same policies it applies to all cases.

Equally dispositive here is the fact that the Union has legitimate non-discriminatory reasons for each action it took with respect to Young-Smith's grievance. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Union has proffered evidence that it applies expedited arbitration in all discharge cases, that the policy against private

counsel's attendance at arbitration exists to enable the Union to focus on the contract between itself and Bayer without distraction from outside counsel, and that the Union has a practice of utilizing more specific CBA provisions in its grievances over general ones. Further, Bischoff testified that while he considered Young-Smith's generalized claim of race discrimination he believed it was a better course to argue specific discrimination in Young-Smith's treatment over a more general claim which would switch the burden of proof to Young-Smith instead of requiring the Union to prove just cause. All of these explanations are not only legitimate (again, evidence that the Union did not act arbitrarily) but they are non-discriminatory. Young-Smith has offered not a single piece of evidence demonstrating that these non-discriminatory explanations were a cover for invidious discrimination.

This said, all Young-Smith has affirmatively shown is that she disagreed with the manner in which the Union opted to present her grievance. This disagreement does not show that the Union acted discriminatorily or arbitrarily. Moreover, she presented no evidence to rebut the legitimate non-discriminatory reasons proffered by the Union for its actions. Thus, on this record, no reasonable jury could conclude that the Union discriminated against Young-Smith in the manner in which it processed her grievance. The Union's Motion for Summary Judgment is therefore GRANTED as to this claim.

**Young-Smith's Discrimination Claim Alleging Refusal to File Grievances**

Young-Smith also asserts that the Union had a practice or policy of not pursuing grievances for race discrimination. A union's deliberate failure to press grievances involving race discrimination is itself discrimination in the enforcement of contract rights that is actionable under section 1981. *See Patterson,* 491 U.S. at 177, 109 S.Ct. at 2373 (reaffirming that section 1981's prohibition upon discrimination in the enforcement of contractual obligations extends to

discrimination by unions); *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987) (holding union liable under section 1981 for following a deliberate policy of never including claims of racial discrimination in its grievances while pursuing thousands of other grievances); *Allensworth v. General Motors Corp.,* 945 F.2d 174, 179 (7th Cir.1991). Indeed, " 'a union which intentionally avoids asserting discrimination claims, either so as not to antagonize the employer and thus improve its chances of success on other issues, or in deference to the perceived desires of its white membership, is liable under both Title [VII] and § 1981, regardless of whether, as a subjective matter, its leaders were favorably disposed toward minorities.' " *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 669, 107 S.Ct. 2617, 2625, 96 L.Ed.2d 572 (1987) (quoting *Goodman v. Lukens Steel Co.,* 580 F.Supp. 1114, 1160 (E.D.Pa.1984) (interpreting Title VII on the issue of racial harassment)); see also *Allensworth v. General Motors Corp.,* 945 F.2d 174, 179 (7th Cir.1991) ("A union's deliberate failure to press grievances involving race discrimination is itself discrimination in the enforcement of contract rights that is actionable under section 1981.") (citations omitted); *EEOC v. Pipefitters Ass'n Local Union 597,* 334 F.3d 656, 656 (7th Cir.2003) (explaining that if a black worker asks the union to grieve a complaint, the union refuses, and the union would grieve the complaint if the worker were white, this would be a "clear violation" of Title VII as well as the union's duty of fair representation).

The court begins by emphasizing that the Union has submitted evidence which tends to demonstrate that it did not maintain a general practice or policy, as plaintiff suggests, of refusing to file race discrimination claims. The record contains nearly a dozen such grievances filed on behalf of black employees. However, this begs the question of whether it is necessary for Young-Smith to prove a Union practice or whether she can merely assert a single violation to establish a claim

under Title VII. Young-Smith maintains that "it takes only one request and a refusal of that request by the Union to trigger a *Goodman* claim." (Pltf's Supp. Brief at p. 8). Although the union at issue in *Goodman* was found to have a general policy against grieving claims of race discrimination, at least one court has determined that a plaintiff need not establish a policy or practice by the Union:

> The union at issue in *Goodman* had maintained a *policy* of "rejecting disparate-treatment grievances presented by blacks solely because the claims assert[ed] racial bias and w[ere] very troublesome to process." *Goodman,* 482 U.S. at 669, 107 S.Ct. 2617. It does not follow, however, that a plaintiff attempting to proceed under Title VII with a claim similar to those brought by the plaintiffs in that case must establish the existence of a discriminatory policy (rather than merely the commission of a single discriminatory act) in order to prevail. Subsection (1) declares it to be an "unlawful employment practice" for a labor organization "to exclude or to expel from its membership, or otherwise to discriminate against, any *individual* because of his [or her] race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e-2(c)(1) (emphasis added). The statutory protections afforded thereunder are implicated when an act of discrimination occurs....

*Hubbell v. World Kitchen, LLC,* 717 F.Supp.2d 494, 502 (W.D.Pa.,2010). *Hubbell* went on to conclude that "because a Title VII claim may be raised when there is a single act of discrimination, a deliberate choice by a union not to process *a grievance* may give rise to a claim against it." *Id.* Applying *Hubbell* in this case, the undersigned concludes that Young-Smith need only demonstrate one act of discrimination to succeed on her claim, not a pattern or practice by the Union of ignoring requests to file race-based grievances.

Before analyzing whether Young-Smith has, in fact, set out evidence to support at least one act of discrimination, the Court must first address two issues that have been raised by the Union with respect to Young-Smith's allegations. First, Young-Smith asserts in both her affidavit and her deposition that in early 2000 through 2004 she requested the Union to file race discrimination grievances on numerous occasions but it refused to do so. To say that the record is vague on the

specifics of these requests is an understatement. In fact, the record is barren of any reliable evidence as to when some of these instances occurred, what allegedly discriminatory act spawned them and to whom she complained. For this reason, the Union has filed its supplemental motion for summary judgment claiming that these instances are time-barred or without sufficient specificity to provide them with notice of what events she is referring to. This Court has carefully reviewed the plaintiff's testimony and agrees that these is insufficient reliability to her statements to permit them as a basis for holding the Union liable on this type of claim. Moreover, since Young-Smith, as demonstrated below, has other incidents that are more specific upon which she can rely to support her claim, these vague assertions are irrelevant to her claim. As a result, the Court GRANTS the Union's Supplemental Motion for Summary Judgment and will not consider the incidents occurring prior to 2004.

Second, Young-Smith submitted an affidavit of Billy Easton wherein he states that while he served on the Joint Committee for Civil Rights numerous black workers complained of differential treatment based on race and the Union did not pursue these complaints. This affidavit is the subject of the Union's Motion to Strike, ¶2. Because, as is discussed below, Young-Smith has sufficient evidence from her own testimony to raise a genuine issue of material fact that a prima case of discrimination exists, the Court will DENY this portion of the Motion to Strike as MOOT.[9]

As with Young-Smith's earlier claim of discrimination in the processing of her discharge grievance by the Union, she must show that: (1) Bayer discriminated against her in a manner which

---

[9]Easton's testimony has not been considered by the court in the factual recitation set out in this Order nor has it been considered in the analysis of Young-Smith's claim.

constituted a violation of the collective bargaining agreement; (2) she affirmatively requested union intervention to redress the discrimination; and (3) the Union deliberately ignored her request. Only upon proof of these elements does the burden shift to the Union to demonstrate a legitimate reason for its actions. *See Hubbell,* 717 F.Supp.2d at 505 ("The inference of discrimination arising from Hubbell's prima facie case shifts the burden of production to the USW entities to articulate a legitimate, nondiscriminatory reason for abandoning the grievance process.").

Young -Smith offers two pieces of evidence that, when construed in her favor, aid her prima facie case. Young-Smith has set out two instances immediately prior to her discharge wherein she alleges that she spoke with Troyer and requested that he file a race discrimination grievance on her behalf. The first instance, she asserts is after Holt made threats in the workplace toward her. She claims she spoke to Troyer about these threats and her concern that white employees were not being subjected to the zero tolerance policy relating to workplace violence. In the second instance, Young-Smith contends that after she was disciplined for failure to attend the June 28, 2006 meeting, she spoke again with Troyer and asked him to file a grievance alleging that white workers who did not attend meetings were not reprimanded or suspended while black workers, such as herself, received suspensions. On both occasions she asserts that Troyer refused to file the grievances. Troyer denies that Young-Smith at any time requested that he file race-based grievances.

Applying these facts to the legal standard above, Young-Smith has raised a genuine issue of material fact as to the prima facie case. If, as she suggests, Bayer was treating black and white workers differently it was violating the anti-discrimination provisions of the CBA. Indeed, Young-Smith asserts that she sought help to remedy that discrimination by requesting that the Union file grievances on her behalf and they refused, thereby permitting the discrimination to go unremedied.

Thus, she has raised a genuine issue of material fact which shifts the burden to the Union to assert legitimate non-discriminatory reasons for its refusal to grieve discrimination claims. And, at this stage, the Union has taken an interesting position. The Union's position is that Young-Smith did not make a request that the Union file any grievances asserting race claims. Thus, it has no legitimate non-discriminatory reason for refusing to file race-based grievances. It's only argument is that it was unaware of any requests by the Plaintiff to file a race discrimination grievance. As a result, the court is left with a credibility question sufficient to permit this claim to proceed to a jury on the ultimate question of whether the Union violated *Goodman*. If, at trial, the jury concludes that Young-Smith did, in fact, request the Union file race discrimination grievances on her behalf and it refused, the Plaintiff will ultimately have to prove that the Union's refusal was based upon discriminatory animus. *Greene v. Potter,* 557 F.3d 765, 769 (7th Cir.2009) ("...the ultimate burden to prove intentional discrimination always remains with [plaintiff]".)[10] If, however, the jury concludes that the Union could not have violated *Goodman* because Young-Smith never requested a race discrimination be filed, the Union prevails.

Because plaintiff has established a genuine issue of material fact related to her contention that the Union failed to process her grievance requests based upon race discrimination, the Union's Motion for Summary Judgment as to this claim is DENIED.

## **Disparate Impact**

Young-Smith's final claim is that the Union's facially neutral policy of attempting to secure

---

[10]Some case law suggests that where a union *deliberately* decides to ignore a member's request to grieve a *known* instance of trait-based discrimination, an inference that the union has acted on the basis of a discriminatory motive can be drawn without specific evidence that a member outside of the plaintiff's protected class has received more favorable treatment. *Rainey v. Town of Warren,* 80 F.Supp.2d 5, 18 (D.R.I.2000).

last chance agreements for discharged workers disparately impacts black employees. (Pltf's Brief at p. 19: "While the Union does not make the decision to discharge a worker part of its job is to represent discharged workers and attempt to get them reinstated. The statistics ....show that the Union did a much better job for white workers than it did for black workers."). What Young-Smith appears to be asserting is a claim that the Union's practice of securing last chance agreements for reinstatement disproportionately affects black workers because they have a higher rate of being discharged even after such agreements are obtained.

To state a disparate impact claim, Young-Smith must establish a prima facie violation by showing that (1) [the union] uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin," *Ricci v. DeStefano*, 129 S.Ct. 2658, 2673 (2009) and (2) statistics or other evidence demonstrate that the practices affected members of the protected group more harshly that other employees. *Price v. City of Chicago,* 251 F.3d 656, 659 (7th Cir.2001).

It is unclear from the briefs what alleged practice of the Union Young-Smith is challenging in her disparate impact contention. She mentions the Union's practice of attempting to obtain last chance agreements for discharged employees. At the same time, she appears to make a more generalized argument that the Union's representation overall disparately impacts black workers. However, she does not explain how that is so. Young-Smith does provide statistics which she asserts demonstrates that a disproportionate number of black workers are discharged from Bayer. On average from 2001-2007 between 14-18% of the union workers at Bayer were black. Of all the workers discharged, black workers make up 40% of the workers discharged. Young-Smith also asserts that over 70% of blacks who were provided last chance agreements were eventually

terminated compared to only 29% of white workers who were provided last chance agreements.

But, what is missing from all of this is any indication that the Union's actions or inactions played any role at all in the disparity in the statistics. What appears clear from the Union's numbers is that when workers were discharged the Union secured last chance agreements about 50% of the time for both black and white workers. And thus, there is no disparity in the manner in which the Union advocated for such agreements for black workers verses white workers. Moreover, to the extent there is discrimination at Bayer which, in turn, leads to the discharge of a disproportionate number of black workers, the Union is not responsible for it. *See EEOC v. Pipefitters Ass'n Local Union* 597, 334 F.3d 656, 659 (7th Cir.2003) ("[W]e reject the EEOC's contention that unions have an affirmative duty to prevent racial harassment or other forms of unlawful discrimination in the workplace."). A union is only responsible for its own discrimination, and here, Young-Smith has provided no evidence that any practice of the Union discriminated against black workers. Thus, she cannot withstand summary judgment on her disparate impact claim. The Union's Motion for Summary Judgment is GRANTED.

## CONCLUSION

Based on the foregoing, the Union's Motion for Summary Judgment is GRANTED in part and DENIED in part. The Union's Supplemental Motion for Summary Judgment is GRANTED. The Union's Motion to Strike is DENIED in all respects as MOOT.

Entered: This 3rd day of March, 2011

s/ William C. Lee
United States District Court